IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION



**FILED**

DEC 21 2018

Clerk, U.S Courts
District Of Montana
Missoula Division

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ADAM WALTER CAMPBELL,

Defendant.

CR 18–5–BU–DLC

ORDER

Defendant Adam Walter Campbell ("Campbell") filed a Motion to Dismiss

or Enjoin Prosecution and Request for Evidentiary Hearing (Doc. 16) on

September 21, 2018. At Campbell's request, and pursuant to *United States v.*

*McIntosh*, 833 F.3d 1163 (9th Cir. 2016), this Court held an evidentiary hearing on

October 16, 2018, and ordered that both Parties file supplemental briefing to

clarify their positions based upon the submitted evidence. The Parties have

complied with this Order and the issue is now ripe for determination. For the

following reasons, Defendant's Motion will be denied.

### BACKGROUND

The following is a summary of the relevant facts elicited during the

*McIntosh* hearing.

-1-

In early 2016, the Missouri River Drug Task Force ("MRDTF") developed a confidential source ("CS") who was employed with Montana Buds, a medical marijuana production and distribution business in Bozeman, Montana. Montana Buds operated in a complex of buildings located at 152, 154, 156, and 160 Zoot Way in Bozeman, Montana. Montana Buds' grow operation was housed in 152, 154, and 156 Zoot Way, while 160 Zoot Way housed a laboratory and the storefront dispensary for Montana Buds' products.

At the behest of the Drug Enforcement Agency ("DEA") the MRDTF coordinated a series of controlled purchases from Montana Buds using the CS. These occurred on March 30, 2016, April 11, 2016, and May 9, 2016, and produced one-quarter pound of marijuana, one-half pound of marijuana, and another one-quarter pound of marijuana, respectively.

On May 18, 2016, the DEA and the MRDTF executed search warrants on the Montana Buds' properties at Zoot Way. Authorities seized significant amounts of marijuana plants from 152 and 154 Zoot Way and discovered gallons of hashish oil (or "hash oil") and a sophisticated butane hash oil laboratory at 160 Zoot Way.[1]

---

[1] While the *McIntosh* hearing produced a significant amount of background information regarding Campbell's alleged crimes, because the Court ultimately decides Campbell's Motion based solely upon his noncompliance with the law regarding the possession and distribution of hash oil, the Court will not undertake a recitation of all of the facts elicited—especially when significant argument exists as to the admissibility of portions of that evidence.

-2-

Based in part on the fruits of this search, a grand jury indicted Campbell of Conspiracy to Manufacture and Distribute Controlled Substances in violation of 21 U.S.C. § 846 ("Count I"), Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 ("Count II"), and Maintaining Drug-Involved Premises in violation of 21 U.S.C. § 856 and 18 U.S.C. § 2 ("Count III"). (Doc. 2 at 1–2.) Count I stems from the allegation in the Indictment that between approximately 2010 and May 18, 2016, Campbell conspired with "known and unknown persons" to manufacture and distribute "more than 1,000 marijuana plants, and marijuana in the form of butane hash oil," in Bozeman, Montana, as well as California and Ohio. Count II alleges that during the same approximate time period, and in Bozeman, Montana, California, and Ohio, Campbell possessed "more than 1,000 marijuana plants, and marijuana in the form of butane hash oil" with the intent to distribute. Count III alleges that during the same approximate time period, Campbell "knowingly and unlawfully used and maintained places located at 152 Zoot Way, 154 Zoot Way, and 160 Zoot Way, in Bozeman for the purpose of manufacturing and distributing marijuana." Lastly, the Indictment contains a forfeiture allegation, pursuant to 21 U.S.C. §853, of 152 and 154 Zoot Way, Bozeman, Montana. (Doc. 2 at 2–4.)

**DISCUSSION**

Campbell contends that his prosecution must be enjoined because he was in compliance with Montana law as it pertains to medical marijuana at all times alleged in the Indictment. As discussed, Campbell has been charged with various marijuana related violations of federal law, specifically the Controlled Substances Act ("CSA"), which prohibits the possession of marijuana regardless of whether it is being used for medicinal purposes. *See Gonzales v. Raich*, 545 U.S. 1 (2005) (CSA, which criminalizes the manufacture, distribution, or possession of marijuana to intrastate growers and users of marijuana for medical purposes, did not exceed Congress' authority under the Commerce Clause).

## I.    *United States v. McIntosh*

Normally, a defendant's compliance with state law is immaterial for purposes of evaluating his culpability under federal criminal law due to article VI, clause 2 of the United States Constitution, also known as the Supremacy Clause. U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *see also Hillsborough County, Fla. v. Automated Med. Laboratories, Inc.*, 471 U.S. 707,

-4-

712 (1985) ("It is a familiar and well-established principle that the Supremacy Clause . . . invalidates state laws that 'interfere with, or are contrary to' federal law."). However, the Ninth Circuit's decision in *McIntosh* brought a defendant's compliance with state medical marijuana laws to the forefront of federal criminal prosecutions for marijuana offenses.

In *McIntosh*, the Ninth Circuit consolidated several interlocutory appeals by defendants who were charged with federal marijuana offenses under the CSA. 833 F.3d at 1168–1169. These defendants were indicted in United States district courts located in California and Washington, two states which implemented statutory schemes providing for the lawful distribution of marijuana for medical purposes. *Id.* at 1169–1170. The defendants moved to dismiss their indictments due to a 2014 congressional rider attached to an omnibus appropriations bill. This rider mandated that:

> None of the funds made available in this Act to the Department of Justice may be used, with respect to the States of Alabama, Alaska, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, and Wisconsin, to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

*Id.* at 1169. Interpreting this language, the *McIntosh* Court determined that, in addition to preventing states from implementing their medical marijuana laws, this rider also prevented the Department of Justice from spending funds on "the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." *Id.* at 1177.

The Ninth Circuit cautioned, however, that these individuals must "*strictly comply* with all state-law conditions regarding the use, distribution, possession, and cultivation of medical marijuana." *Id.* (emphasis added). Consequently, prosecution by the Department of Justice of individuals who are not in strict compliance with all state medical marijuana laws is permitted under the rider. The *McIntosh* Court also stressed that individuals who distribute marijuana are still violating federal law and this rider "does not provide immunity from prosecution for federal marijuana offenses." *Id.* at 1179 n.5. Rather, the rider simply prevents the federal government from temporarily expending funds on the prosecution of certain defendants. *Id.*; *see also id.* at 1173–1174 ("When Congress has enacted a legislative restriction like [the rider] that expressly prohibits DOJ from spending funds on certain actions, federal criminal defendants may seek to enjoin the expenditure of those funds, and we may exercise jurisdiction over a district court's direct denial of a request for such injunctive relief.").

Thus, to determine if the Department of Justice could continue with the prosecution of the defendants, all of whom contended that they were in compliance with their respective state medical marijuana laws, the *McIntosh* Court remanded for further deliberations. *Id.* at 1179. Specifically, the Ninth Circuit found that the defendants were "entitled to evidentiary hearings to determine whether their conduct was completely authorized by state law, by which we mean that they *strictly complied* with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." *Id.* (emphasis added).

While the Ninth Circuit did not provide direction regarding either the burden of proof or standard of proof to be applied during the prescribed hearing, this Court has previously dealt with these issues. In *United States v. Jesse Walter Campbell*, No. CR 16–21–BU–DLC, Doc. 62 (D. Mont. May 9, 2017), this Court decided that the Government bears the initial burden of proof to establish by a preponderance of the evidence that a defendant is not in strict compliance with Montana's marijuana laws and, if proved, the burden shifts to the defendant to show by a preponderance of the evidence that he was in compliance.

Having held the hearing required by *McIntosh*, the Court now proceeds to analyze whether or not the United States has shown by a preponderance of the

evidence that Campbell was not in strict compliance with Montana's marijuana laws and, if so, whether Campbell has rebutted that showing by a preponderance of the evidence. The Court begins with a summary of the applicable laws.

## II. Montana Marijuana Act

In Montana, the use and cultivation of marijuana for medical purposes is permitted under certain circumstances. *See* Mont. Code Ann. § 50–46–301 (2017). The legal status of medical marijuana in Montana has evolved in a convoluted and confusing manner. In 2004, the voters of Montana adopted I-148, the Montana Medical Marijuana Act, which carved out an exception for users and cultivators of medical marijuana from the state's general prohibition on marijuana use. *Montana Cannabis Indus. Ass'n v. State*, 286 P.3d 1161, 1163 (Mont. 2012). This act was later superseded and revised by the Montana Legislature and renamed the Montana Marijuana Act ("MMA"). *United States. v. Washington*, 887 F. Supp. 2d 1077, 1083 (D. Mont. 2012); *see also* Mont. Code Ann. § 50–46–301 (2015). In 2011, following the widespread increase in medical marijuana users and providers, the Montana Legislature repealed the previous version of the law and replaced it with a new, more restrictive, statutory framework. *See* Mont. Code Ann. §§ 50–46–301 through 344 (2011).

Importantly, the 2011 version placed numerous restrictions on the distribution of medical marijuana by providers, including limiting the number of patients a provider may assist and implementing a prohibition on the commercial sale of marijuana. Mont. Code Ann. §§ 50–46–308(3), (4), (6)(a) (2011) (mandating that a provider may assist no more than three medical marijuana cardholders and precluding the provider from accepting "anything of value, including monetary remuneration, for any services or products provided to a registered cardholder"). The 2011 version of the MMA was subsequently challenged in various courts in Montana.

In 2015, the Montana First Judicial District Court, Lewis and Clark County, issued an order permanently enjoining several provisions of the 2011 MMA, including the provisions of the law which prohibited the commercial sale of marijuana. *Mont. Cannabis Ind. Assoc. v. State*, 2015 WL 69777 (Mont. Jan. 2, 2015). Thus, following the district court's order, it was arguably legal under state law for a medical marijuana provider to have more than three patients and to accept compensation for providing medical marijuana. Following successive rounds of appeals, however, the Montana Supreme Court reversed the district and reinstated some of the statutory restrictions on the commercial sale of Montana, including the three person limit. *Montana Cannabis Indus. Ass'n v. State*, 368

-9-

P.3d 1131, 1153 (Mont. 2016). In a later order, the Montana Supreme Court delayed the implementation of the Act's restrictions on the number of patients a provider could assist until August 31, 2016. *Montana Cannabis Indus. Ass'n v. State*, DA 15-0055 (Mont. Apr. 25, 2016). Thus, from January 2, 2015, until August 31, 2016, Campbell, as a licensed provider of medical marijuana, could sell medical marijuana to an unlimited number of patients, assuming compliance with other provisions of the MMA.

## III. Campbell's Compliance under the Montana Marijuana Act

Following the *McIntosh* hearing, the United States argues that Campbell and Montana Buds did not strictly comply with all provisions of the 2015 MMA[2] for four reasons. First, Campbell and Montana Buds distributed marijuana to patients in amounts greater than one ounce, the amount allowable under Montana Code Annotated § 50–46–319(1)(a) (2015). Second, Campbell and Montana Buds distributed marijuana to persons "in Cleveland, Ohio and Pennsylvania" who did

---

[2] For purposes of Campbell's prosecution, the 2015 MMA is the applicable law. *See Medical Marijuana Growers Ass'n v. Corrigan*, 281 P.3d 210, 214 (Mont. 2012) ("We have held that 'persons alleged to have committed criminal offenses must be charged with violating the law in effect at the time the crime was committed."); Mont. Code Ann. § 1–2–205 ("The repeal of any law creating a criminal offense does not constitute a bar to an indictment or information and the punishment of an act already committed in violation of the law so repealed unless the intention to bar such indictment or information and punishment is expressly declared in the repealing act."); *see also State v. Daniels*, 64 P.3d 1045; 1047 (Mont. 2003) (declining to find distinction between modification and repeal for purposes of application of § 1–2–205); *Bell v. Maryland*, 378 U.S. 226, 232 (1964) (finding state's savings clause relevant to application of common law abatement rule).

not qualify to be registered cardholders because they were not residents of Montana as required by § 50–46–302(12). Third, Campbell and Montana Buds imported "shatter," a form of hash oil, into Montana from California despite the requirement established in § 50–46–308(5) that marijuana "must be cultivated and manufactured in Montana." Lastly, Campbell and Montana Buds manufactured and distributed hash oil that did not qualify as a controlled substance permitted for manufacture, use, possession, or distribution under the 2015 MMA. (Doc. 36 at 8–12.)

The United States carries the burden of showing that Campbell violated the MMA in the preceding four ways by a preponderance of the evidence. Because the Court ultimately finds the last ascribed act of noncompliance determinative, the Court begins and ends its analysis there. The United States argues that "nothing in the MMA or the administrative rules in existence during the period covered by the indictment provided that hashish or hash oil is a substance subject to the MMA." (Doc. 36 at 11.) Additionally, the United States asserts that the question of whether or not hash oil falls within the MMA's protections was decided by the Montana Supreme Court in *State v. Pirello*, 282 P.3d 662 (Mont. 2012). (Doc. 36 at 11.) For the following reasons, the Court agrees.

The MMA allows a provider of marijuana or "marijuana-infused products" to possess "4 mature plants, 12 seedlings, and 1 ounce of usable marijuana for each registered cardholder who has named the [provider] as the registered cardholder's provider." § 50–46–319(1)(b). Numerous definitions are controlling to the analysis of whether or not "marijuana," "marijuana-infused product," or "usable marijuana" includes hashish. First, the MMA defines "marijuana" as "all plant material from the genus Cannabis containing tetrahydrocannabinol (THC) or seeds of the genus capable of germination." § 50–32–101(18). This definition is adopted from the definition of marijuana provided in Montana Code Annotated § 50–32–101(18) which, in turn, adopted the definition found within the Montana Controlled Substances Act ("MCSA"). § 50–46–302(5); *Pirello*, 282 P.3d at 664. Second, "marijuana-infused product" is defined as "a product that contains marijuana and is intended for use by a registered cardholder by a means other than smoking" and includes "but is not limited to edible products, ointments, and tinctures." § 50–46–302(6). Lastly, "usable marijuana" is defined as "the dried leaves and flowers of the marijuana plant and any mixtures or preparations of the dried leaves and flowers that are appropriate for the use of marijuana by a person with a debilitating medical condition" that does not include the "seeds, stalks, and roots of the plant." § 50–46–302(20).

-12-

Consistent with the United States' argument, none of these definitions explicitly provide for hashish or hash oil, despite the fact that the MCSA, from which the MMA drew its definition of "marijuana," also defines "hashish." Section 50–32–101(14) provides that "[h]ashish, *as distinguished from marijuana,* means the mechanically processed or extracted plant material that contains [THC] and is composed of resin from the cannabis plant." (emphasis added). The MMA provides a "narrow exception to the [MCSA.]" *Pirello*, 282 P.3d at 665. After review, it is apparent that the MMA does not include hashish within that narrow exception. Consequently, the Court is satisfied that the United States has established by a preponderance of the evidence that Campbell and Montana Buds' manufacture, use, possession, and distribution of hash oil violates the MMA.

The Court's conclusion on this issue is buttressed by the Montana Supreme Court's decision in *Pirello*. In *Pirello*, the Montana Supreme Court was tasked with deciding whether the 2009 MMA's definition of "usable marijuana" was expansive enough to include hashish. The Montana Supreme Court found that "in order to have been considered 'useable marijuana,' the substance . . . needed to be a preparation of the intact 'plant material from the genus cannabis.'" In contrast, when the marijuana plant material is "mechanically processed or extracted" to reduce it to resin, as required to produce hashish, "the substances cease[s] to fall

-13-

within the definition of 'marijuana,' and therefore [cannot] be contained within the definition of 'useable marijuana.'" *Pirello*, 282 P.3d at 664–65. Consequently, the Court held that hashish was not protected by the 2009 MMA. *Id.* at 665.

Here, of course, we are dealing with the 2015 MMA that, as pointed out by Campbell, allows certain providers to "manufacture and provide marijuana-infused products" that include but are not limited to "edible products, ointments, and tinctures." §§ 50–46–302(6)(b), (7); 309(1); 319(1)(b). Campbell raises several arguments to support his position that his manufacture and distribution of hash oil was in compliance with the MMA. First, Campbell asserts that *Pirello* is inapplicable because it only dealt with whether hashish is "usable marijuana" under the 2009 MMA and not whether hashish was subsequently sanctioned by the inclusion of "marijuana-infused products" in the 2015 MMA. (Doc. 37 at 5–6.) Second, Campbell contends that the 2015 MMA was so ambiguous that the rule of lenity should apply and require an interpretation of the MMA in Campbell's favor. (*Id.* at 6–9.) Lastly, Campbell asserts that the 2017 MMA, which condones the "chemical manufacturing" of "marijuana concentrate," should be applied retroactively to preclude a finding that he was not in strict compliance with the MMA in 2016. (*Id.* at 9–10.) The Court addresses these arguments in order.

-14-

#### A. The applicability of *State v. Pirello*

First, Campbell contends that the Montana Supreme Court in *Pirello* did not

"deal with the allowable method to make marijuana-infused products" and,

consequently, is inapplicable. While it is true that the Court in *Pirello* did not

address the allowable method for making marijuana-infused products, that does not

render the decision inapplicable here.

As discussed above, *Pirello* stands for the proposition that, under the 2009

MMA, hashish was not included in the "six marijuana plants and 1 ounce of usable

marijuana" which a "qualifying patient and that qualifying patient's caregiver"

could possess. 282 P.3d at 664–665 (quoting § 50–46–201(2) (2009)). The 2015

MMA similarly limits providers, including providers of marijuana-infused

products, to possession of "4 mature plants, 12 seedlings, and 1 ounce of usable

marijuana for each registered cardholder who has named the person as the

registered cardholder's provider." § 50–46–319(1)(b) (2015). The definition of

"usable marijuana" in the 2015 MMA is also substantially the same as the

definition in the 2009 MMA.[3] Both versions of the MMA allow for "any mixture

---

[3] The 2009 MMA defined "usable marijuana" as "the dried leaves and flowers of marijuana and any mixture or preparation of marijuana" but not the "seeds, stalks, and roots of the plant." § 50–46–103(10). The 2015 MMA similarly defines "usable marijuana" as "the dried leave and flowers of the marijuana plant and any mixtures or preparations of the dried leaves and flowers that are appropriate for the use of marijuana by a person with a debilitating medical condition" but not the "seeds, stalks, and roots of the plant." § 50–46–302(20).

-15-

or preparation of marijuana" and have an identical definition for "marijuana." *Compare* § 50–32–101(17) (2009), *with* § 50–32–101(18) (2015). Consequently, in order for Campbell's argument to succeed, the definition of "marijuana-infused product" must itself provide an independent basis upon which the Court can include hashish in the MMA's protections.

Again, "marijuana-infused product" is defined as "a product that *contains marijuana* and is intended for use by a registered cardholder by a means other than smoking" and "includes but is not limited to edible products, ointments, and tinctures." § 50–46–302(6) (2015) (emphasis added). Because this definition mandates that the product "contains marijuana," the holding in *Pirello* is directly implicated. There, the Court found that when the marijuana "plant material was 'mechanically processed or extracted' in a manner that reduced it to resins, the substance ceased to fall within the definition of 'marijuana.'" 282 P.3d at 664–65 (quoting § 50–32–101(14) (2009) (the definition of "hashish")). If a marijuana-infused product must contain marijuana, and hashish is not marijuana, then hashish is not a marijuana-infused product. Consequently, the Court's finding in *Pirello* is applicable here and militates against Campbell's argument.

-16-

### B. The rule of lenity

Second, Campbell claims that because the 2015 MMA allowed for the provision of marijuana-infused products but "gives no direction on how a provider should infuse a product," the MMA is ambiguous and the rule of lenity requires the MMA be interpreted in Campbell's favor. (Doc. 37 at 6–9.) The United States responds that nothing in the MMA's definition of "marijuana-infused product" could have been interpreted as allowing for the separation of THC from marijuana for infusion into another product. And, further, that the MMA is far from being so grievously ambiguous as necessary for the rule of lenity to apply. (Doc. 39 at 14–16.)

Campbell's reliance on the rule of lenity is misplaced. The Ninth Circuit has held that under the rule of lenity, "when a criminal statute is ambiguous, we interpret the statute in favor of the defendant." *United States v. Wyatt*, 408 F.3d 1257, 1262 (9th Cir. 2005) (internal quotation marks and citation omitted). However, for the rule of lenity to apply, there must be "grievous ambiguity or uncertainty in the statute" and the Court must be left in a position where it can do "no more than guess as to what Congress intended" after "seizing everything from which aid can be derived." *Id.* (internal quotation marks and citation omitted).

Whatever the flaws the MMA may have, it is not so grievously ambiguous or rife with uncertainty as to render it susceptible to the rule of lenity.

As has been extensively discussed, although the 2015 MMA allowed for marijuana-infused products, by definition, those products were required to "contain[ ] marijuana." "Marijuana" being a defined term in itself, the Court then looks to that definition, provided by the Montana Controlled Substances Act: "Marijuana . . . means all plant material from the genus cannabis containing [THC] or seeds of the genus capable of germination." § 50–32–101(18) (2015). It is telling to compare this definition with that of "hashish" as it is defined in the MCSA. Again, "hashish" is "distinguished from marijuana" and "means the mechanically processed or extracted plant material that contains [THC] and is composed of resin from the cannabis plant." § 50–32–101(15). As the United States points out, the production of hash oil is the process of extracting "the key psychoactive controlled substance in marijuana, THC, from the plant material" into a highly condensed form—resin. (Doc. 39 at 14.) Relying solely on definitions provided by the Montana legislature, the Court is satisfied that it intended marijuana-infused products to be those products infused with marijuana, not those infused with a highly-condensed psychoactive resin.

"[S]eizing everything from which aid can be derived," the Court's finding on the Montana legislature's intent is reinforced by considering the impact of the statutorily stated purpose of the MMA—to provide "legal protections to persons with debilitating medical conditions who engage in the use of marijuana to alleviate symptoms" and "allow for the limited cultivation, manufacture, delivery, and possession of marijuana." § 50–46–301(2)(a)–(b). Among those "legal protections" advanced by the MMA are a provider's protections from arrest, prosecution, and penalization for that individual's cultivation, manufacture, possession, or transportation of marijuana in compliance with the MMA and a registered cardholder's protections from the same for that individual's possession or use of marijuana in compliance with the MMA. § 50–46–319(2). These protections are significant because, under both Federal and Montana law, it is a crime to manufacture, possess, or distribute controlled substances. 21 U.S.C. § 841; Mont. Code Ann. §§ 45–9–101 through 208.

Specifically, Montana prohibits the manufacture, possession, or distribution of a "dangerous drug." § 45–9–101(1) (distribution); § 45–9–102(1) (possession); § 45–9–110(1) (production, manufacture, preparation, cultivation, compound, or process). In each of the Montana statutes making these activities a crime, the definition of "dangerous drug" is provided by the MCSA. The MCSA defines

"dangerous drug" as "a drug, substance, or immediate precursor in Schedules I through V set forth in Title 50, chapter 32, part 2." § 50–32–101(6). Importantly, in addition to being distinguished by definition, hashish and marijuana are *separate* Schedule I drugs. *Compare* § 50–32–222(4)(u) (hashish), *with* § 50–32–222(4)(x) (marijuana).

If the Montana legislature had intended to extend the MMA's legal protections to the use of hash oil, it could have easily done so. The Court finds no ambiguity or uncertainty in the 2015 MMA resulting from the inclusion of marijuana-infused products or "the absence of statutory prohibition" of hash oil, notwithstanding Campbell's arguments to the contrary. (Doc. 37 at 8.) In the absence of "grievous ambiguity or uncertainty" in the MMA, the rule of lenity is inapplicable. *Wyatt*, 408 F.3d at 1262.

## C. Retroactive application of the 2017 MMA

Lastly, Campbell argues that the 2017 MMA has enacted changes to the 2015 MMA that "clarified the ambiguity surrounding marijuana-infused products" which should be applied retroactively to condone Campbell and Montana Bud's conduct in 2016. (Doc. 37 at 9.) Campbell asserts that "[c]larifying legislation is assumed to apply retroactively when an amendment is a clarification, rather than an alteration of existing law, then it should be used in interpreting the provision in

question retroactively." (*Id.* at 10 (citing *Montoya v. Orange County Sheriff's Dep't*, 987 F. Supp. 2d 981 (C.D. Cal. 2013); *United States v. Innie*, 77 F.3d 1207 (9th Cir. 1996)).)

Under Montana law, as under federal law, statutes do not operate retroactively unless the legislature plainly intended them to do so. § 1–2–109 (2017); *Valles v. Ivy Hill Corp.*, 410 F.3d 1071, 1079 (9th Cir. 2005). Further, under Montana law "a change in the definition of an offense does not affect acts committed prior to the effective date." *Daniels*, 64 P.3d at 1047. However, as relied on by Campbell, the Ninth Circuit "has consistently stated that when an amendment is a clarification, rather than an alteration, of existing law, then it should be used in interpreting the provision in question retroactively." *Innie*, 77 F.3d at 1209 (internal quotation marks and citation omitted). This is because clarifications to a statute are not interpreted as substantively changing the statute but, rather, as merely providing clarification for application of the law. *Vasquez v. North County Transit Dist.*, 292 F.3d 1049, 1056–57 (9th Cir. 2002); *United States v. Madera-Gallegos*, 945 F.2d 264, 267 n. 2 (9th Cir. 1991).

To determine whether an amendment "merely clarifies, rather than changes, existing law," the Court examines the language of the statute in order to infer the intent of the legislature. *Vasquez*, 292 F.3d at 1056–57; *Jeffries v. Wood*, 114 F.3d

-21-

1484, 1495 (9th Cir. 1997) (en banc), *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc). Referring to Senate Bill 333, Campbell claims that the Montana legislature's amendment of the MMA was intended to "clarif[y] the ambiguity surrounding marijuana-infused products." (Doc. 37 at 9.) However, looking to Senate Bill 333, there is no mention of clarifying any ambiguity over marijuana-infused products. *See* S.B. 333, 2017 Mont. Laws Ch. 408. Moreover, the amendment is substantive rather than merely clarifying for the following reasons.

Campbell appears to assert that the 2017 MMA's allowance for marijuana-infused products providers to "engage in chemical manufacturing" of "marijuana concentrate" that is defined as "any type of marijuana product consisting wholly or in part of the resin extracted from any part of the marijuana plant," is itself indicative of the legislature's intent to clarify the MMA. (*Id.* (citing §§ 50–46–302(2), (10) (2017); S.B. 333, 2017 Montana Laws Ch. 408, § 5 (enacted as § 50–46–308(7)(a)(ii))).) However, these changes do not merely clarify the MMA, the changes provide for a previously nonexistent endorsement to engage in chemical manufacturing—an addition the legislature found to be a "privilege" that is distinct from the "privilege" of being a marijuana-infused products provider. § 50–46–

312(1). The Court is not convinced that this is mere clarification.[4] Therefore,

Campbell's argument regarding retroactive application of the 2017 MMA is

unavailing.

In light of the above, the Court finds that Campbell has failed to show by a

preponderance of the evidence that he was in strict compliance with the 2015

MMA. Accordingly,

IT IS ORDERED that Campbell's Motion to Dismiss or Enjoin Prosecution

(Doc. 16) is DENIED.

DATED this 21st day of December, 2018.

Dana L. Christensen, Chief Judge
United States District Court

---

[4] Because the Court finds that the changes enacted in the 2017 MMA are not mere clarifications and, consequently, are not eligible for retroactive application to this case, the Court need not decide the question of whether the 2017 MMA authorizes the manufacture, possession, or distribution of hashish and refrains from so doing.